02-10-448-CV.REH









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00448-CV

 

 


 
 
 In the Interest of J.P., T.J., and D.F., Children
 
 
  
 
 
  
 
 


 

 

----------

 

FROM County
Court at Law No. 1 OF Wichita COUNTY

----------

 

MEMORANDUM
OPINION[1] ON
REHEARING

----------

 

On
December 15, 2011, this court issued a memorandum opinion affirming the
termination of Mother’s parental rights and reversing and remanding the
termination of Father’s parental rights.  The Texas Department of Family and
Protective Services filed a motion for rehearing, complaining of a nine-word
phrase that could cause confusion to future litigants and arguing that the
evidence was factually sufficient to support the jury’s finding that
termination of Father’s parental rights is in J.P.’s best interest.  We deny the
Department’s motion for rehearing but withdraw our prior memorandum opinion and
judgment dated December 15, 2011, and substitute the following in its place to
delete the nine words complained of by the Department.

I.  Introduction

This
is a termination of parental rights appeal.  In three issues, Appellant Mother challenges
the trial court’s order terminating her parental rights to J.P., T.J., and D.F.;
in five issues, Appellant Father challenges the trial court’s order terminating
his parental rights to J.P.[2]  We will affirm as to
Mother and reverse and remand as to Father.

II.  Factual
and Procedural Overview[3]

Mother
was thirty at the time of the termination trial and had given birth to six
children—J.P., J.K., T.J., D.F., T.F., and G.M.-B.—but had never been married
to any of the fathers of her six children.  Of the six children, only G.M.-B.
lived with Mother at the time of trial.

The
Texas Department of Family and Protective Services[4]
initially filed a petition in December 2005 to terminate Mother’s parental
rights to T.J. and D.F. When the statutory dismissal date of June 2007
approached, the trial court entered a final order naming Mother as possessory
conservator of T.J. and D.F.

The
Department filed a suit concerning J.P. in September 2006.  But in August 2008,
the Department agreed that it was in the best interest of J.P. for Mother and Father
to remain J.P.’s possessory conservators, and the Department was named
permanent managing conservator of J.P.  The Department abandoned its petition.

In
July 2010, the Department filed another petition for termination of Mother’s
and Father’s parental rights concerning J.P., T.J., and D.F.  After a trial, a
jury returned a verdict terminating Mother’s parental rights to J.P., T.J., and
D.F. and terminating Father’s parental rights to J.P.  The trial court signed a
termination order based on the jury’s verdict, and this appeal followed.[5]

III.  Issues Presented

          Mother
raises three issues on appeal.  She argues that the trial court abused its
discretion by admitting testimony and evidence regarding incidents occurring
prior to June 15, 2007, for T.J. and D.F., and prior to August 29, 2008, for
J.P.; that there was legally and factually insufficient evidence to show that
circumstances had changed materially and substantially as required to support
termination under family code section 161.004; and that the trial court abused
its discretion by denying her requested changes to the jury charge.

          Father
raises five issues on appeal.  He argues that the evidence is legally and
factually insufficient to support the jury’s best interest finding, that the
evidence is legally and factually insufficient to support termination under family
code section 161.004, and that the trial court abused its discretion by admitting
testimony and other evidence regarding incidents occurring prior to August 29,
2008, regarding Father and/or J.P.

IV.  Burden
of Proof and Standards of Review

A.  Burden
of Proof

          A
parent’s rights to “the companionship, care, custody, and management” of her
children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  In a termination
case, the State seeks not just to limit parental rights but to erase them
permanently—to divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child’s right
to inherit.  See Tex. Fam. Code Ann. § 161.206(b) (West 2008);
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick, 685 S.W.2d at 20–21; In re R.R.,
294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In
re D.T., 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet.
denied).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also § 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

B.  Legal
Sufficiency Standard of Review

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

          We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not unreasonable. 
Id. at 573.

C.  Factual
Sufficiency Standard of Review

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the verdict with our own.  In re
H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated a provision of section 161.001(1) and that the
termination of the parent-child relationship would be in the best interest of
the child.  Tex. Fam. Code Ann. § 161.001; In re C.H., 89 S.W.3d
17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence
that a reasonable factfinder could not have credited in favor of the finding is
so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.  If we reverse on factual
sufficiency grounds, then we must detail in our opinion why we have concluded
that a reasonable factfinder could not have credited disputed evidence in favor
of its finding.  J.F.C., 96 S.W.3d at 266–67.

V. 
Termination Was
Proper As
to Mother

Based
on Findings
Under Section
161.001(1)

 

Mother’s
second issue challenges the sufficiency of the evidence to show under family
code section 161.004 that circumstances had materially and substantially
changed since the prior orders denying termination of Mother’s parental rights
to T.J., D.F., and J.P.  Mother’s second issue presupposes that, after an order
denying termination has been entered, family code section 161.004 is the
exclusive statutory vehicle available for any subsequent termination.  We recently
held that section 161.004 does not provide the exclusive grounds for terminating
a parent’s parental rights following entry of an order denying termination in a
prior termination proceeding.  See In re K.G., 350 S.W.3d 338, 352 (Tex.
App.—Fort Worth 2011, pet. filed) (overruling mother’s issue claiming that section
161.004 presented exclusive grounds for termination of her parental
rights—after denying first petition to terminate—was under section 161.004(b)).

Here,
the Department pleaded grounds for terminating Mother’s parental rights not
only under section 161.004, but also under various subsections of family code
section 161.001(1), including subsection (M).  Concerning subsection (M), the
Department pleaded that Mother “has had her parent-child relationship
terminated with respect to another child based on a finding that the mother’s
conduct was in violation of § 161.001(1)(D) or (E), Texas Family Code, or substantially
equivalent provisions of the law of another state.”  See Tex. Fam. Code
Ann. § 161.001(1)(M) (West 2008).  The court’s charge authorized the jury to
base a termination finding on this ground, and the final order of termination
specifies that clear and convincing evidence exists supporting termination of
Mother’s parental rights based on this ground.  Yet, Mother does not attack on
appeal the section 161.001(1)(M) ground or any of the other non-section-161.004
grounds for termination pleaded, submitted to the jury, and specified as
grounds for termination in the final termination order.  When, as here, Mother
does not challenge an independent ground that may, under the record presented,
support the judgment that she seeks to reverse, this court may not address
either the challenged grounds or the unchallenged grounds and has no choice but
to overrule the challenges that Mother has chosen to assert.  See In
re A.V., 113 S.W.3d 355, 361 (Tex. 2003) (holding that father’s failure to
challenge sufficiency of evidence to support finding under one subsection of
section 161.001(1) made it unnecessary––when best interest finding had been
made––to address father’s challenges to other grounds for termination); Fletcher
v. Dep’t of Family & Protective Servs., 277 S.W.3d 58, 64 (Tex.
App.—Houston [1st Dist.] 2009, no pet.) (holding that because mother’s appeal
challenged only three of the six grounds for termination found by the trial
court, and because any of the unchallenged findings––along with the best interest
finding––would support the order of termination, it was unnecessary to address
mother’s issues challenging only three of the grounds).  Because Mother did not
challenge on appeal the independent ground under subsection (M) of section
161.001(1) that may, under the record presented,[6] support
the final order of termination of Mother’s parental rights to T.J., D.F., and
J.P., we overrule Mother’s second issue challenging the termination under
section 161.004.  See, e.g., Fletcher, 277 S.W.3d at 64.

          Because
the order of termination was proper on section 161.001(1)(M) grounds, any error
in the trial court’s admission of evidence related to the prior termination
proceedings was harmless; we therefore overrule Mother’s first issue.  See
K.G., 2011 WL 3211210, at *11 (holding that error in admitting evidence
from time period before denial of Department’s first petition was harmless
because termination was proper on section 161.001(1)(N) grounds).  We need not
address Mother’s third issue, challenging the denial of her requested jury
charge language concerning submission of section 161.004 grounds for
termination, in light of our holding that the termination order is supported by
section 161.001(1)(M) grounds; we therefore overrule Mother’s third issue.

VI. 
Evidence Was
Not Factually
Sufficient to Support
Jury’s

Best
Interest Finding
Terminating Father’s
Parental Rights

Under
Section 161.001(2)

 

          In
his first and second issues, Father challenges the legal and factual
sufficiency of the evidence to support the jury’s finding that termination of
his parental rights to J.P. was in J.P.’s best interest.

A.  Presumption
and Law on Best Interest

          There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  

          Here,
the jury was asked to consider the following nonexclusive factors in
determining the best interest of the child:

(A)     the desires
of the child;

 

(B)     the emotional
and physical needs of the child now and in the future;

 

(C)     the emotional
and physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody; 

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

(F)     the plans for
the child by these individuals or by the agency seeking custody;

 

(G)     the stability
of the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and

 

(I)      any
excuse for the acts or omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).

          These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

B.  Overview
of J.P.’s Situation

          Due
to J.P.’s unique emotional challenges and circumstances at the time of trial,
we set forth some of those details here before analyzing the evidence related
to the Holley factors.

          J.P.
was eleven at the time of the termination trial and had been in CPS’s care about
half of his eleven years.  Father described J.P. as “a real nice little boy”
who is very active, loves to play, and enjoys meeting new people.  J.P. liked
to play football, basketball, baseball,[7] and
video games.  Johnson said that J.P. is a “really neat kid, but he does have
some issues.”  J.P. has some learning issues, including dyslexia.  J.P. also
exhibited mental and emotional problems, which became worse while he was in
foster care.

          J.P.
was admitted to psychiatric hospitals three times while in foster care.  After
he was hospitalized, J.P. was diagnosed with “major depression recurrent” and was
placed on antidepressants. 

          J.P.
had multiple “meltdowns”; it was hard for him to cope with the regular stresses
of life.  J.P. experienced meltdowns at school that resulted in numerous calls
to his foster parents and to CPS.  J.P. was almost expelled from school because
of his behavior.

          He
also exhibited oppositional behaviors in which he would not wear his seat belt,
would get out of a car, and would run down the road.  During one visit while
Father was in the restroom, J.P. took the elevator downstairs, ran out the
door, and took off running through the parking lot, which is located on a very
busy street.  He did not run across the street, but that was CPS’s fear.  J.P.
ran to Father and gave Father a hug when Father was able to get down to the
parking lot.

          After
J.P. became aggressive in foster care, he was admitted to Red River, where a
level of care was determined.  He then went to a residential treatment center
(RTC).

          At
the time of the termination trial, J.P. had been in the RTC in Belton receiving
special care for his mental health issues for three or four months, and he was
making improvements but was not ready to be released.  At the RTC, J.P. lived
in a cottage with eight other boys in his age range and had house parents who
stayed at the cottage in different shifts.  J.P. was required to comply with
the rules, to not be oppositional, to go along with the program, and to complete
his chores, and when he met his goals, he was rewarded by being able to play
video games. 

          J.P.
attended school on the RTC’s campus and had therapy with a therapist and
psychiatrist.  According to Johnson, J.P. was enjoying school more than
previously; he was in a charter school on campus with ten students, a teacher,
and an aide.  The school implemented a dyslexia program to assist J.P. Johnson
said that J.P. was proud of maintaining a high level of performance and was
thriving at the RTC because he was “getting a lot of help that he really
needed.”

C.  Analysis
of Holley Factors

1.  Desires
of the Child

          Although
J.P. did not testify at trial, the evidence established that Father and J.P.
are well bonded, that the two have a normal father-son relationship, and that
J.P. wanted to live with Father.

2.  Emotional and
Physical Needs and Dangers of J.P.

Now and in the Future

          As
mentioned above, J.P. had been diagnosed with dyslexia and “major depression
recurrent.”  Both of these conditions require treatment, which he was receiving
at the RTC.

          The
record also established that the one constant in J.P.’s eleven years of life,
half of which were spent in CPS care, was Father.  Father consistently supported
J.P. financially; Father paid child support when J.P. went to foster care and
had a credit for overpaying child support at the time of the trial.  Father
consistently visited J.P., rarely missing a visit.

          J.P.
calls Father “Daddy,” runs to him, and hugs him at the visits.  On the rare
occasions when Father was unable to visit, J.P. said that he was upset and
disappointed.  During J.P.’s visits with Mother (which preceded his visits with
Father), J.P. anticipated Father’s visit and asked whether Father was there and
whether he was coming.  Prior to admission to the RTC, J.P. had expressed
suicidal thoughts after one of J.P.’s very close friends was killed in a
car-train collision; because J.P. was closely bonded to Father and because of
J.P.’s difficulties dealing with the death of his friend, a reasonable concern exists
as to how J.P. would handle having Father removed from his life.

3.  Father’s
Parental Abilities

          Father
testified that he was forty-five years old and has three children, but only his
son J.P. is involved in this case.  Father said that J.P. was eleven at the
time of trial and that his birthday is June 4.

          Father
participated in special education classes and graduated from high school, but
he did not know how to read and write very well.  Despite his reading problems,
Father had been working for a little over thirty years.  At the time of the
trial, Father was working at Taylor Foundry and had been working there for
almost fourteen years.  Father does not have a car, so he walks to his job and
to the visits with J.P.

          Father
loves J.P., has always been involved in his life, and has never physically
abused J.P.  Father supported J.P. when he lived with J.P., has paid child
support while J.P. has been in foster care, and had a credit for overpaying
child support at the time of the trial.  Father regularly visits J.P., and CPS
described the visits as “very good.”

          CPS
claimed that occasionally during visits with J.P., Father would not say the
right thing.  For instance, Johnson said that Father would sometimes show up to
visits being very negative and berate J.P. for not having his hair cut; Father
would tell J.P. that he was not coming back to visit if J.P. did not have his
hair cut by the next visit.  Father admitted that he had told
J.P. that he was getting fat; he said, “That’s the way black people is, man. 
We don’t live and think the way y’all do.”

          Moreover,
Father did not appear to understand J.P.’s mental and emotional vulnerabilities. 
Father
did not agree that J.P. had problems.  Father said that “[J.P.] act[s] like any
other kid would if you take [him] away from [his] parents” and force him to
live with “strange kids.”  Father said that the way J.P. laughs, talks, does
his homework, and goes to school is all normal.  When Father was asked whether
it was normal that J.P. threatened suicide, he said,

          [J.P.]
never threatened -- I don’t understand why y’all can’t see it.  I have seen a
lot of little kids get mad.  The kids get mad and say, Oh, I’m gonna kill
myself.  Kids does that stuff.  Why y’all can’t see that?  I’ve seen white kids
do it, Mexican kids do it.  Kids do and say stuff like that when they angry. 
But y’all look at it like he gonna hurt somebody.  He’s not gonna hurt anybody.


When
Father was asked about times when J.P. was not mad when he threatened suicide,
Father said that J.P. does “stuff like that” because he is not with his family
but is with strangers.

          Father
did not understand why J.P. had been put on medication because he gets angry.  Father
said that nothing was wrong with J.P.’s mind and that CPS was destroying J.P.’s
mind.[8]  Father
told J.P. that he did not need to take his medicine “because some white doctor
gave it to him” and that he was only given the medicine because he is black.  Father
said that J.P. has never run away from the visitation center, that J.P. has run
to him after a visitation, and that J.P. should not be given medication
because of running to him.  When asked whether Father thought J.P. needed
medication if he is bipolar, he said, “If that’s what y’all think.  What I
think, it don’t matter.”

          When
Father was asked how he would deal with J.P.’s anger problem, Father said that
he would talk to J.P. and hit J.P.’s hand.  When Father was asked how he would
handle J.P.’s threatening to kill himself after a friend died, Father said that
he would handle the situation by telling J.P. that everyone is going to die,
that there is no need to kill himself, and that God does not want him to do
that.

          Father
admitted that he was not currently able to provide stable housing for J.P. 
When shown pictures of a house that J.P. had lived in where nails were sticking
out of boards, Father thought that it was normal and saw no danger to J.P.

          Father
also believed that it was acceptable for his son to be around people who hit
women.  Father, however, said that it was not okay for his son to be around
people who did drugs and that he was not on drugs when he visited J.P.  Father
told Johnson that he used cocaine, that he had raised all of his children while
occasionally using cocaine, and that he did not have a problem with it; he thought
that people could raise their children and use cocaine.

4.  Programs
Available to Assist J.P.

          At
the time of trial, J.P. was in a RTC receiving specialized care[9] for
his mental and emotional issues and was thriving.  Additionally, the charter
school that J.P. was attending through the RTC had implemented a dyslexia
program to assist him.  Johnson opined that after J.P. is released from the
RTC, he will be placed in a therapeutic foster home where his special needs can
continue to be addressed.

5.  Father’s
Plans and CPS’s Plans for J.P.

          CPS
caseworker Tammy Durham had several conversations with Father about J.P.’s
coming to live with him, but Father said that he could not provide a safe and
appropriate home for J.P.  Father testified that he had told Durham “about a
few months ago” that the way his life was going, he did not want to bring J.P.
to his level because if Father brought J.P. to his level, then he would miss
out on sports and school because Father lacked transportation.  Father said
that J.P. deserves “more.”  But Father said that keeping his relationship with
J.P. is “everything” to him. 

          Johnson
believed that it was in J.P.’s best interest that Father’s parental rights be
terminated so that J.P. could be placed for adoption.  In making the
recommendation regarding terminating Father’s parental rights to J.P., Johnson
took into account Father’s parental abilities, the programs available to J.P.
from the Department, and the stability that the Department can provide J.P.  At
the time of trial, J.P. was not an adoptive placement, but Johnson believed
that J.P. could be adopted in the future.

6.  Stability
of Proposed Placement

          At
the time of the termination trial, eleven-year-old J.P. was receiving
specialized care in a RTC and was expected to be there for six to twelve
months.  From the RTC, CPS expected J.P. to be moved to a therapeutic foster
home and supposed that then twelve-to-almost-thirteen-year-old J.P. could be
adopted.  Because J.P. was not an adoptive placement at the time of the trial,
CPS did not present any evidence as to the stability of the proposed placement.

7.  Acts
or Omissions of Father

          Father
admitted that even knowing that he was going to trial where he could lose his
parental rights, he had still used marijuana two weeks prior to trial and had used
cocaine and crack about a month prior to trial.  Father said that he could not
provide a safe and appropriate home for J.P. at the time of trial, but wanted
to maintain his relationship with J.P.  And Father has not played an active
role in helping J.P. overcome his emotional issues.

8.  Excuses
for Father’s Acts or Omissions

          Father
told his counselor that the only reason he was in this situation was because
“some white woman wants my kid” and that he was tired of “being messed with.”  Father
testified that the reason J.P. was placed in CPS’s care was that Mother did not
“have her stuff together” and that the reason J.P. is still there is because
Father cannot get him out because Father does not have “his stuff together.”  Father
admitted that he could not take J.P. home with him because “I ain’t got myself
together.”  Father could not put a date on when he would have his act together
or how long J.P. would have to wait.  Father said that it may look like he has
not been trying to get J.P. back, but he was “gettin’ a little bit better.” 
And Father repeatedly testified that maintaining his relationship with J.P. was
“everything” to him.

D.  Legally
Sufficient Evidence of Best Interest

We
hold that, viewing the evidence in the light most favorable to the judgment and
disregarding evidence contrary to the trial court’s best interest finding
unless a reasonable factfinder could not, the following evidence (among other
facts) could have reasonably persuaded the jury that termination of Father’s
parental rights is in J.P.’s best interest:  (1) Father had been abusing drugs
for years and had used crack, cocaine, and marijuana during the month prior to
the termination trial; (2) Father was not in a position to provide stable
housing for J.P. at the time of trial or in the immediate future; (3) Father had
failed to acknowledge J.P.’s mental health issues and had on one occasion instructed
J.P. that it was okay to not take his medication; and (4) Father did not see a
problem if J.P. was exposed to domestic violence or unsafe living conditions.  See
J.P.B., 180 S.W.3d at 573; In re N.A., No 02-10-00022-CV, 2010 WL
3834640, at *8 (Tex. App.—Fort Worth Sept. 30, 2010, no pet.) (mem. op.). 
Because we hold that the evidence is legally sufficient to support the best
interest finding, we overrule Father’s first issue.

E.  Factually
Insufficient Evidence of Best Interest

Viewing
all of the evidence, however, no reasonable factfinder could form a firm belief
or conviction that the termination of Father’s parental rights to J.P. was in
J.P.’s best interest.  The disputed evidence on whether termination of Father’s
parental rights was in J.P.’s best interest is such that a reasonable
factfinder could not have resolved that disputed evidence in favor of its
finding.  See J.F.C., 96 S.W.3d at 266.  The disputed evidence that a
reasonable factfinder could not have credited in support of its finding that
termination of Father’s parental rights to J.P. was in J.P.’s best interest
included evidence that J.P. loved and wanted a relationship with Father, that
Father loved and wanted a relationship with J.P., that Father and J.P. were
well-bonded, that Father was the one constant that J.P. had in his life, that
termination of Father’s rights while J.P. was in a fragile emotional state from
the death of a close friend could be detrimental to J.P., that Father had
regularly visited J.P., that Father had provided for J.P. financially
throughout his life, that J.P. was older and suffered from mental health issues
and was therefore less likely to be adopted, that no foster family had
indicated a desire to adopt J.P., that the Department had no adoptive placement
ready at the time of the termination trial, that the grounds for terminating
Father’s rights did not involve allegations of physical abuse or sexual abuse
of J.P., that there were no allegations that Father had a lengthy criminal
history, and that Father had worked for thirty years and had held the same job
for the last fourteen years.  The evidence that the jury could have credited in
support of its finding that termination of Father’s parental rights to J.P. was
in J.P.’s best interest included evidence that Father did not have a stable
home, had an extremely low standard of what housing conditions were okay for J.P.,
thought some domestic violence was normal, continued to use drugs when he was
not around J.P., had on occasion told J.P. not to take his medication, and had
on occasion said inappropriate things like threatening not to visit J.P. if he
did not cut his hair.  Giving due consideration to the evidence that the jury
could have credited in support of its finding that termination of Father’s
parental rights to J.P. was in J.P.’s best interest nonetheless, the evidence
that a reasonable factfinder could not have credited in favor of the finding is
so significant that a factfinder could not reasonably have formed a firm belief
or conviction that termination of Father’s parental rights to J.P. was in
J.P.’s best interest.  Viewing the evidence under the relevant standard of
review, the evidence is factually insufficient to defeat the strong presumption
that maintaining J.P.’s relationship with Father is in his best interest.  See
R.R., 209 S.W.3d at 116; H.R.M., 209 S.W.3d at 108; N.A.,
2010 WL 3834640, at *11.  We therefore sustain Father’s second issue.

Because
our holding on Father’s second issue is dispositive, we decline to address his
other issues.  See In re C.T.E., 95 S.W.3d 462, 469 (Tex. App.—Houston
[1st Dist.] 2002, pet. denied) (declining to address father’s other issues,
including whether trial court improperly admitted evidence of father’s conduct
prior to date trial court terminated mother’s parental rights—but not
father’s—and appointed TDFPS as managing conservator and whether evidence was
legally and factually insufficient to support endangerment finding, after
holding evidence factually insufficient to support best interest finding); see
also Tex. R. App. P. 47.1 (stating appellate court need only address every
issue necessary to final disposition of appeal).

VII.  Conclusion

          Having
overruled each of the issues presented by Mother, we affirm the trial court’s
judgment terminating Mother’s parental rights to J.P., T.J., and D.F.  Having
sustained Father’s second issue, we reverse the trial court’s judgment
terminating Father’s parental rights to J.P. and remand his case for a new
trial.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
GARDNER,
WALKER, and MCCOY, JJ.

 

DELIVERED: February 23, 2012









[1]See Tex. R. App. P. 47.4.





[2]The fathers of T.J. and
D.F. did not appeal the termination of their parental rights.





[3]The record in this case is
voluminous, containing sixteen volumes of reporter’s records and sixteen
volumes of clerk’s records, plus a supplemental clerk’s record.  Based on our
disposition of the issues raised, we set forth only an overview of the
procedural and factual background here.  Additional facts related to Father are
set forth below in our analysis of Father’s challenge to the best interest
finding.





[4]We refer to the Texas
Department of Family and Protective Services interchangeably as “the
Department” and “CPS.”





[5]This is the third termination
appeal addressing Mother’s parental rights; we previously affirmed orders terminating
Mother’s parental rights to J.K. and to T.F.  See In re J.G.K., No.
02-10-00188-CV, 2011 WL 2518800, at *45 (Tex. App.—Fort Worth June 23, 2011, no
pet.) (mem. op.); In re T.T.F., 331 S.W.3d 461, 489 (Tex. App.—Fort
Worth 2010, no pet.).





[6]The record establishes that
Mother’s parental rights to T.F. were terminated in September 2009 and that
Mother’s parental rights to J.K. were terminated in May 2010; both terminations
were based on section 161.001(1)(D) or (E) endangerment findings.  See
J.G.K., 2011 WL 2518800, at *45; T.T.F., 331 S.W.3d at 489.





[7]According to CPS
Supervisor Linda Johnson, J.P. is one of the most talented athletes whom she has
ever seen and was the most valuable player on his “midget” football team,
having been recruited as a nine year old.





[8]Father said that J.P. is
the same person in foster care that he was before he was removed except that he
probably gets upset more often because he is not with his family.  Father
believes that it is a nightmare for any child to be away from his family.





[9]Johnson explained the
levels of care in the foster system: basic is the standard care that a parent
would provide; a level above that is moderate, in which a child has therapeutic
needs such as counseling, extra help at school, or behavior issues; and the
highest level is specialized, in which a child has significant mental health
needs.